INTERNATIONAL RESOURCE RECOVERY, INC.,
Plaintiff,

v.

The UNITED STATES, Defendant,

and

Rolloffs Hawaii, Inc., Intervenor.

No. 04–154C.

United States Court of Federal Claims.

Filed under seal March 5, 2004 [1].

Reissued: March 15, 2004.

David J. Gierlach, Honolulu, Hawaii, for Plaintiff; Stephen C. Tosini, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

Capt. Scott Flesch, Army Counsel, Washington, D.C. and Darrell Burdasch, Army Counsel, Honolulu, Hawaii, for Defendant; Donald A. Tobin, Bastianelli, Brown & Kelley, Washington, D.C., for Intervenor.

## ORDER AND OPINION DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

WILLIAMS, Judge.

This post-award bid protest comes before the Court on Plaintiff's motion for a preliminary injunction seeking to enjoin performance of a contract for trash pickup services.[2] Plaintiff, the incumbent, contends that the Army's rejection of its proposal for failure to submit a mobilization plan was arbitrary and capricious because Plaintiff was already fully mobilized and the Army, as a matter of past practice, had not required mobilization plans from incumbents.

The Court declines to issue an injunction, finding that Plaintiff failed to comply with a mandatory requirement of the solicitation calling for a mobilization plan, and there is

1. This opinion was issued under seal on March 5, 2004. The Court invited the parties to submit proposed redactions by March 11, 2004. No redactions having been received, the Court publishes this opinion *in toto*, correcting errata.

2. Plaintiff's motion was filed on February 20, 2004. Defendant and Intervenor filed oppositions on February 25, and the Court heard oral argument on February 26, 2004, and issued an oral ruling at that time, denying Plaintiff's motion. This Opinion memorializes and explains that ruling. The Court expedited its consideration of the motion because the awardee, Rolloffs Hawaii, Inc., had been transitioning since December 10, 2003, and was scheduled to take over the trash pickup services at issue on March 1, 2004.

no legal authority suggesting that the Army was obligated to waive that requirement for incumbents. Nor did Plaintiff demonstrate that the Army had a past practice of waiving the mobilization plan requirement for incumbents.

Plaintiff's failure to demonstrate any likelihood of success on the merits impedes its ability to meet the remaining factors for injunctive relief. Plaintiff cannot be deemed to be irreparably harmed by the loss of its ability to compete for this contract when it failed to comply with the solicitation. In contrast, the harm to the awardee and the Army by enjoining performance of the contract would be significant since the awardee has commenced performance. The public interest in ensuring the integrity of the procurement process is best served by upholding what the Army did here—enforcing the terms of the solicitation equally for all offerors.

### Background [3]

#### Plaintiff's Prior Contract

On June 29, 2001, Plaintiff International Resource Recovery, Inc. (IRRI) was awarded Contract No. DAPC50–01–C0027 for refuse pickup at industrial sites on military bases on the island of Oahu, Hawaii. IRRI successfully completed performance of this contract, and the Army exercised options to extend performance.

#### The Solicitation

In February 2003, the Army issued a new solicitation for these services. IRRI was among seven bidders to respond to the solicitation. The solicitation required the submission of technical proposals, a pricing schedule, performance risk information and offeror representations and certifications for commercial items.

The RFP cautioned offerors that they were required to complete each section of the proposal and that failure to submit a complete proposal could render that proposal unacceptable. The solicitation stated that the Army intended to evaluate offerors and award a contract without discussions and that the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Army reserved the right to conduct discussions if later determined by the Contracting Officer (CO) to be necessary.

The solicitation contained an instruction to offerors requiring that at a minimum, the proposal shall contain the following five items: 1) a signed Standard Form 1449, "Solicitation/Contract/Order for Commercial Items;" 2) Technical Proposal; 3) Pricing Schedule; 4) Performance Risk Information; and 5) Completed "Offeror Representations and Certifications—Commercial Items." [4]

The evaluation factors were stated in descending order of importance as follows:

1. Technical Capability
   a. Project Staffing
   b. Mobilization/Phase–In
2. Quality Control
3. Performance Risk
   a. Past Performance
   b. Work Experience
4. Price

AR, Tab 13, Attachment 3.

Under the Technical Capability factor, the solicitation contained the following evaluation factors regarding the mobilization plan:

2. Subfactor (b) Mobilization Plan:

a. *Contents.* The offeror must explain in detail its plan to successfully accomplish the mobilization process 120 days prior to the contract start date. *At a minimum,* the proposed plan *must* include the following:

(1) Detailed procedures of how your firm plans to obtain and transport the necessary containers/compactors/rolloffs to Hawaii, and position them in accordance with Technical Exhibits 1 and 2. The plan must be supported with documentation, including financial capabili-

---

**3.** This background is derived from the Administrative Record (AR) filed on February 24, 2004, as supplemented.

**4.** Plaintiff contends that this instruction is the only minimum mandatory requirement in the solicitation, and that because the listed items did not specify a mobilization plan, none was required. Tr. at 20, 37–38.

ty to acquire the necessary vehicles and equipment with prospective vendor(s). The plan must provide a timetable designating the dates (i.e. day one, day two, etc.) at which events are scheduled to occur (i.e. obtaining equipment, shipment of equipment, assembly of containers, positioning of equipment, hiring of workforce, etc.).

(2) How your firm plans to obtain the necessary labor workforce.

(3) List type and quantity of vehicles to be utilized under this contract. Indicate if vehicles are leased, to be purchased, or owned.

(4) List number of containers owned, or to be acquired for each type of container (i.e. 3–cubic yard, 8–cubic yard, 20 cubic yard rolloffs, 30 cubic yard rolloffs, 40 cubic yard rolloffs, 30 cubic yard compactors). Indicate timetable for assembly/painting/stenciling of containers, as required.

b. *Evaluation Criteria.* The Government *will evaluate and rate the content,* effectiveness and probability of success of the offeror's mobilization plan. Mobilization plans will be considered in the best value trade off decision. Supporting documentation to confirm equipment acquisitions and realistic timetable are *major areas of scrutiny* by the Government.

AR, Tab 13, Attachment 3 at 2–3 (emphasis added).

The Army issued nine amendments to the RFP. Amendment 0008 gave the Army the option to purchase the containers at the end of the contract performance period. The fact that the containers were going to be owned by the Army at the end of the contract was a significant difference between this procurement and the prior contract. Koike Dep. at 35.

### IRRI's Proposal

On February 16, 2003, IRRI submitted its initial proposal, but did not submit any document designated as a mobilization plan. IRRI represented that it had "all personnel, vehicles, equipment, tools, and containers on hand and in-place to perform the services required by this contract." AR, Tab 16 at 7.

IRRI also provided a spreadsheet containing a list of the vehicles and labor it planned to use, but this did not list containers or indicate whether the vehicles or the containers were owned or leased. Neither the proposal nor the spreadsheet contained documentation supporting IRRI's financial capability to acquire the vehicles and equipment. On June 16, IRRI submitted a revised proposal in response to Amendment 8 via facsimile transmission and again submitted the spreadsheet, but did not include any further information on its mobilization plan.

### The Rejection of IRRI's Proposal

On October 31, 2003, the Army rejected IRRI's proposal because it failed to provide a mobilization plan. The Army pointed out that IRRI stated it would augment its current vehicles with a new frontloader but did not state how it would acquire the vehicle or provide supporting documentation as to IRRI's financial capability to acquire the vehicle. Further, IRRI failed to indicate if vehicles and containers were owned, leased or to be purchased and failed to list the number of containers.

### The CO's Alleged Past Practice

IRRI claims that the Army had a past practice, documented in a Pre-negotiation Objective Memorandum and Price Negotiation Memorandum of June 26, 2001, of not requiring a detailed mobilization plan from an incumbent contractor in conjunction with its proposal. This Pre-negotiation Memorandum reflecting negotiations on a prior procurement, on which Plaintiff also bid, involving the same CO, Ms. Koike, addressed the then-incumbent's proposal stating:

(2) Mobilization Plan. The TEC gave this offeror a rating of "Excellent" based on the fact that this offeror is the incumbent and therefore would not require mobilization. This offeror stated that it would retain employees who have been performing the work under the existing contract for over two years. It stated that since it owns all the necessary equipment and vehicles, minor changes in the statement of work would have a minimum impact on the mobilization. This offeror also included a general schedule of collection ser-

vices, by base, as well as a detailed schedule by individual location. Since the containers, compactors and roll-offs are already in place, performance risk would be lower with this offeror. However, *the Contracting Officer determined that this offeror's plan was no better or no worse than other offerors' plans.* Therefore, the Contracting Officer downgraded the rating to "Good."

Defendant's Opposition to Plaintiff's Oral Motion to Take Discovery, Attachment 1 at 8 (emphasis added).

The CO, Ms. Koike, testified that the incumbent, Horizon, submitted a mobilization plan as part of its offer in the 2001 procurement, and that Horizon's mobilization plan was evaluated by the Army as part of its source selection decision. Koike Dep. at 41–42.

When asked why he believed IRRI did not need to submit a mobilization plan, Plaintiff's principal testified:

A. Because I bid on contracts all the time and many of them where we have been the incumbent, and we had not been required to—in discussions with the—on the prior contract during the period this document was prepared, the prior contracting officer had discussed, after award, this information with me.

Q. First, which previous contracts did you bid on where you did not submit a mobilization plan where one was required in the solicitation?

A. I have never submitted a mobilization plan where one was required and I was the incumbent—I never had one required when I was the incumbent contractor, so I've never submitted one when I was the incumbent contractor.

Q. All right. You also stated that your belief that you didn't need to submit mobilization plans arose partially from

discussions with contracting officers. Who were those contracting officers with whom you had the discussions?

A. Specifically this contract I'm talking about. Mary Engebretson.

Q. When did you have those discussion[s] with her?

A. After award of this contract. Some time[ ] in 2001 and—during the summer months.

. . . .

Q. In those post-award discussions, something was said that made you believe incumbent contractors do not need to submit mobilization plans? Yes or No?

. . . .

A. Something—that discussion validated my understanding that no solicitation requires you to submit something that you can't respond to.

. . . .

Q. Did Ms. Engebretson ever say that Horizon did not submit a mobilization plan?

A. I don't know if she said that, but when—I don't know that she used those words, but my understanding of the conversation was that it wasn't required and wasn't submitted, and later it was confirmed it wasn't submitted in this document and in other documents that I saw.[5]

Johnson Dep. at 13–15; 28.

### Award to Rolloffs

On October 30, 2003, award was made to Rolloffs. IRRI's price was lower than that of Rolloffs. On November 8, 2003, IRRI filed a protest with the General Accounting Office (GAO), and on November 10, 2003, the Army notified Rolloffs to stop performance pending resolution of the GAO protest. On December 8, 2003, GAO dismissed IRRI's protest, and on December 10, 2003, the Army

---

5. The only document of record supporting this testimony is the Pre-negotiation memorandum quoted above which itself references the incumbent's plan. Although Mr. Johnson testified that he saw "other documents" to confirm that Horizon had not submitted a plan, no such other documents are in the record, and Plaintiff did not seek leave to supplement the record with any such documents. *See* Johnson Dep. at 30.

directed Rolloffs to proceed with performance.

In order to perform this contract, Rolloffs purchased containers and compactors for $387,252.52, frontloaders for $352,643 and rolloff trucks for $235,406 and spent $57,124 to ship this equipment from the mainland United States to Hawaii. Rolloffs' equipment expense for this contract totaled $1,032,425.

As of February 12, 2004, all of the containers purchased by Rolloffs had been delivered to Hawaii and were being assembled. Several of the compactors had arrived in Hawaii; the remaining compactors were on a cargo ship en route to Hawaii. Two rolloff trucks and one frontloader had arrived in Hawaii; the second frontloader was on a cargo ship en route to Hawaii.

Some of the equipment which Rolloffs purchased is unique to this contract. In order to purchase the containers and vehicles required to perform this contract, Rolloffs borrowed a total of $1,000,869—and had to begin paying off these loans at the end of February, 2004. As of February 24, 2004, Rolloffs' total expenses incurred on this contract were $1,062,425. Henriques Decl. ¶¶ 8–11, 13–15, 17–19 and 20–21.

### IRRI's Sale of Assets

By letter dated February 23, 2004, IRRI advised the Army that it sold all of its assets to Greenleaf Distribution Services, Inc. (Greenleaf) in October of 2003, but that this would not affect IRRI's service or operation for the Army.

### The Writ of Execution

On February 20, 2004, the Circuit Court of the First Circuit of the State of Hawaii issued a Writ of Execution commanding the local sheriff to levy upon and seize the personal property of IRRI, including various waste disposal equipment such as trucks, trash compactors and commercial trash containers or receptacles used by IRRI in its waste collection and disposal business on the military installations in Hawaii.

### Discussion

### Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). In a bid protest action, the Court reviews the agency's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

Because bid protest actions are subject to the APA standard of review, the Court is generally limited to the administrative record, unless there is a genuine need to supplement that record arising from the particular circumstances of a case. As explained in this Court's Opinion of February 13, 2004, the Court permitted supplementation of the record with two limited depositions. Plaintiff alleged arbitrary and capricious conduct by the Army in deviating from a past practice allowing incumbents to forego submitting mobilization plans without being disqualified. The Court determined that because such past practice could not be illuminated by the administrative record on the instant procurement, a limited deposition of the Contracting Officer was appropriate. The Court also allowed Defendant to take the deposition of Plaintiff's principal to clarify the extent of IRRI's submission of a mobilization plan in this procurement, as well as IRRI's reliance on the Army's past practice of evaluating incumbents' mobilization plans, as these matters were not fully explained by the record.

During oral argument on Plaintiff's Motion for a Preliminary Injunction, by agreement of the parties and order of the Court, paragraphs 10–15 of the Affidavit of Henry Johnson, dated February 23, 2004, were stricken. In addition, the Court granted Defendant's Motion for Leave to File Correspondence from IRRI, which addressed IRRI's recent sale of its assets to Greenleaf. The Court also permitted supplementation of the record with a Writ of Execution issued by the Circuit Court in Hawaii on February 20, 2004, authorizing a levy on IRRI's property, including trucks, trash compactors and contain-

ers located on military installations in Hawaii, reasoning that this information could be relevant to IRRI's claim of prejudice, as well as IRRI's ability to perform.

### The Standards for Injunctive Relief

■ Injunctive relief is an extraordinary remedy. *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) ("[I]njunctive relief [is] awardable . . . only in extremely limited circumstances.") (citation omitted). In considering whether to issue a preliminary injunction, the Court is required to consider four factors: (1) the likelihood of Plaintiff's success on the merits of its complaint; (2) whether Plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in Plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). No one factor is dispositive to the Court's inquiry; "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC,* 3 F.3d at 427; *ES-KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999).

### Likelihood of Success on the Merits

■ In the bid protest context, success on the merits means that the agency decision was arbitrary, capricious, an abuse of the agency's discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). For an agency decision to be upheld, it must have been reached after the agency considered the relevant factors and be "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 104, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

Plaintiff has claimed that the Army's rejection of its offer for failure to submit a mobilization plan was arbitrary and capricious because the Army knew its capability to mobilize since it was the incumbent. At first blush, Plaintiff's argument has a visceral appeal. How can an agency rationally disqualify an offeror for failure to submit a mobilization plan when that offeror as the incumbent was fully mobilized? The problem with Plaintiff's argument is that the solicitation clearly required detailed mobilization plans from all offerors without regard to status as an incumbent.[6] GAO consistently has held that an agency is not required to overlook a flawed proposal on the basis of an offeror's prior performance as an incumbent. *Dylantic, Inc.,* 95-2 CPD P 197.[7] Rather, it is well established that all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals. *Id.; Management Technical Servs.,* 93-1 CPD P 432, 1993 WL 197594. IRRI contends that it did not have to submit a mobilization plan because as the incumbent, the Army was well aware of its ability to perform the contract and thus a plan specifying how it would carry out the contract was unnecessary. However, Plaintiff's failure to submit a plan left a void in the information to be evaluated—there was no documentation of Plaintiff's financial capability to acquire the equipment and no indication of the number and type of containers or whether the vehicles or containers were to be owned or leased[8]—a significant matter where the Army had the option of assuming ownership of containers at the end of the contract. As such, the Army reasonably rejected IRRI's proposal.

Plaintiff has lodged three arguments in support of its protest: 1) the solicitation was

---

6. Some commentators have criticized procurement methodologies which emphasize "essay writing" rather than what an agency knows about an offerors' actual capabilities. *See, e.g.,* R. Nash & J. Cibinic, *Postscript II: The Technical Proposal,* 12 No. 5 Nash & Cibinic Rep. ¶ 28 (1998) ("[E]ven if an agency knows the offeror understands the work, it may evaluate it as not understanding the work on the basis of a poorly-written proposal. Forget reality—just play the game!"). It is not the role of this Court to redefine the rules of the game in a post-award bid protest.

7. Although this Court is not bound by GAO decisions, the Court recognizes GAO's longstanding expertise in bid protests and accords GAO decisions due regard. *Gentex Corp. v. United States,* 58 Fed.Cl. 634 (2003); *Integrated Business Solutions, Inc. v. United States,* 58 Fed.Cl. 420 (2003).

8. Plaintiff's contention that the Army necessarily knew that vehicles and containers were owned because of an assignment of the proceeds of the contract is not supported by the record. *See* Tr. at 52–54.

ambiguous as to whether a mobilization plan was required for incumbents; 2) the Army treated the inclusion of a mobilization plan as a "go/no-go" requirement without advance warning; and 3) IRRI reasonably relied on the past practice of the Army of not requiring mobilization plans from incumbent contractors.

In support of its first argument, Plaintiff contends that only the five "sections" listed in the solicitation's instructions were minimum mandatory requirements, i.e. Standard Form 1449, Technical Proposal, Pricing Schedule, Performance Risk Information, and Offeror Representations and Certifications–Commercial Items. Plaintiff contends that because these requirements did not mention a mobilization plan, such a plan was not a mandatory requirement, and to the extent that Defendant intended the plan to be a requirement, the solicitation was ambiguous. The Court does not agree. First, the mobilization plan was part of the technical proposal which was one of the five listed requirements Plaintiff admits were mandatory. The solicitation expressly advised offerors that the proposal had to be "complete" or risk being unacceptable. Second, the discrete requirements governing the mobilization plan were clearly mandatory, and Plaintiff cannot simply read these provisions out of the solicitation. In describing the mobilization plan, the solicitation stated that "[t]he offeror *must* explain in detail" its mobilization plan and items which, "[a]t a minimum, the proposed plan *must* include," i.e. a description of mobilization procedures for containers/compactors/rolloffs, its workforce, vehicles including whether they were to be leased, purchased, or owned, and the number of containers owned, or to be acquired. Finally, the solicitation provided that the Army "will evaluate" the content, effectiveness and probability of success of the plan. As such, the requirement for submitting a mobilization plan had all the earmarks of a minimum

mandatory requirement. *Cf. Gentex Corp. v. United States*, 58 Fed.Cl. 634, 650 (2003) (performance specifications which used the world "shall" and were stated to be threshold requirements were requirements).

Plaintiff claimed that it would have been impossible for IRRI to have submitted a written plan of how it was going to mobilize because it already had mobilized. The Court disagrees. Nothing prevented Plaintiff from communicating the identity and ownership of the vehicles and containers and supporting documentation in the manner detailed in the solicitation.[9]

Plaintiff's second argument is likewise unavailing. The Army did treat the inclusion of a mobilization plan as a "go/no-go" requirement—but not without advance warning. The solicitation warned offerors that award could be made without discussions and that incomplete proposals could be deemed unacceptable.

Finally, Plaintiff claims that the Army's conduct was arbitrary and capricious in deviating from its past practice of not requiring submission of a mobilization plan from an incumbent. Even assuming *arguendo* that deviating from a past practice could constitute arbitrary and capricious conduct in this context, a matter the Court does not decide, Plaintiff has not proven that the Army had a "past practice" to waive mobilization plan requirements for incumbents. The lone incident memorialized in a 2001 memorandum did not establish that the Army had a past practice of waiving the requirement for a mobilization plan. Rather, that memorandum and the contracting officer's testimony suggested that the incumbent had submitted a mobilization plan at that time which was evaluated in that procurement. Mr. Johnson's testimony to the contrary is hearsay and unsupported by any documentary evidence.[10] Finally, IRRI's reliance on this so

---

9. Plaintiff's claim that the solicitation contained a latent ambiguity with respect to the mobilization plan as to incumbents also fails. The requirement for a mobilization plan was clear, and there was no relaxation or waiver of that requirement for an incumbent.

10. Mr. Johnson's deposition testimony was equivocal, based upon one conversation he had almost three years ago and documents which have not been introduced. Mr. Johnson's affidavit, filed after his deposition, did little to put any more meat on this bare-boned allegation. He stated:

called "past practice" was not reasonable in the face of a solicitation that clearly required a mobilization plan, particularly where the Army would not have all the information necessary to make an informed selection without such a plan.

### Irreparable Injury

IRRI contends that it will be irreparably harmed if the procurement is not enjoined because it will lose the opportunity to compete on a level playing field. Such a lost opportunity to compete has been found sufficient to constitute irreparable harm. *United Payors and United Providers Health Servs., Inc. v. United States,* 55 Fed.Cl. 323, 333 (2003). However, in a situation such as this where Plaintiff has not demonstrated a likelihood of success on the merits, and the Court concludes the playing field was as level as the law requires, the possibility of irreparable harm becomes remote. *Cf. Washington State Dept. of Servs. for the Blind v. U.S.,* 58 Fed.Cl. 781, 797 (2003). ("Because the merits issue here is determinative, the Court need not address any of the other bases for DSB's request for injunctive relief.").

### Balance of Hardships

Under this factor the Court must consider the harm to the Army and to the awardee, Rolloffs, if a preliminary injunction is granted. *ES–KO v. United States,* 44 Fed.Cl. 429, 435 (1999). IRRI contends that it would be harmed because it "has expended substantial resources to provide containers and workers to satisfactorily service the Government," and has been "deprived of a fair and even-handed competition" due to the arbitrary and capricious actions of the Army eliminating it from the competition. Pl.'s Mot. at 18. However, the Court has determined that IRRI was likely treated in accordance with the solicitation here and will not suffer the harm inflicted by an unfair competition.

In contrast, were its performance to be enjoined, Rolloffs would suffer greatly. Rolloffs has already spent $1,032,425 purchasing the trucks, compactors and containers necessary to perform the contract. Much of this equipment is currently in place at various staging areas and the remaining equipment en route to Hawaii. Some of this equipment is unique to this contract, and Rolloffs must immediately begin repaying the loans obtained to finance the equipment purchases. The Army would similarly be harmed, since a preliminary injunction would severely jeopardize Rolloffs' ability to perform the contract, potentially leaving the Army without a viable contractor to collect refuse. For these reasons, the balance of hardships favors the Army and Rolloffs, not IRRI.

### Public Interest

Generally the public interest is served by ensuring fair and open competition in the procurement process. *Cincom Sys. v. United States,* 37 Fed.Cl. 266, 269 (1997) (*citing Magellan Corp. v. United States,* 27 Fed.Cl. 446, 448 (1993)). Here, the agency's enforcement of the requirements of the solicitation furthers this policy.

### Conclusion

**IT IS HEREBY ORDERED THAT:**

1. Plaintiff's motion for a preliminary injunction is **DENIED**.

2. The Court has issued this Opinion under seal in accordance with the Court's Protective Order. The parties are directed to file any proposed redactions to this Opinion no later than **March 11, 2004**.

3. The Court will convene a telephonic status conference to discuss further proceedings in this case on March **16, 2004 at 3:00 p.m. EST**. The conference will be transcribed, and the Court will initiate the call.

---

I was aware that [contracting officer], in the context of the identical industrial contract, did not *apparently* require a mobilization plan from the previous incumbent, Horizon Waste, Inc.
Johnson Aff. ¶ 9 (emphasis added).